## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| The Orange Rabbit, Inc. and<br>Nicholas Giacopelli, | Case No. 19-cv-687 (MJD/ECW) |
| Plaintiffs, | |
| v. | **ORDER** |
| Franchoice, Inc. and<br>Ray Fanning, | |
| Defendants. | |

This matter is before the Court on Plaintiffs' Motion to Amend Complaint (Dkt. 79) ("Motion").  For the reasons stated below, the Motion is denied.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

### A.      General Background

Plaintiffs initiated this case on March 14, 2019 along with the filing of several related cases (involving different plaintiffs) against Defendant FranChoice, Inc. ("FCI"), a franchise broker, and a number of its agents, including Defendant Ray Fanning ("Fanning"), related to their referral of a franchise opportunity to Plaintiffs involving non-party ILKB, LLC ("ILKB"), the franchisor of "iLoveKickboxing.com" franchises. (*See* Dkt. 1.)

In response to Defendants' motion to dismiss the Complaint (in the present case and some other related cases), on April 23, 2019, Plaintiffs filed an Amended Complaint. (Dkt. 14.)  While the Complaint contained a fraud claim, Defendants argued that the claim should be dismissed because the claims lacked sufficient specificity pursuant to

Rule 9(b) of the Federal Rules of Civil Procedure.  (Dkt. 9 at 1-2.)  The Amended

Complaint also contained a claim for common law fraud.  (Dkt. 14 ¶¶ 30-32.)

Defendants then filed a Motion for Partial Dismissal of the Amended Complaint on May

8, 2019.  (Dkt. 18.)  However, Defendants did not move to dismiss the fraud-related

claim for a lack of particularity under Rule 9(b).  (*See* Dkt. 20.)

## B.    The Parties' Joint Discovery Plan and the Court's Scheduling Orders

On May 14, 2019, counsel for both parties developed and filed a Joint Discovery

Plan applicable to this case and the other seven cases that had been filed at that time.

(*See Mount Holly v. FranChoice*, Case No. 19-cv-00300 (MJD/ECW), Dkt. 24.)  The

Joint Discovery Plan provided in relevant part as follows:

> The parties have collectively identified the following factual issues which
> should be common to all cases in ILKB Franchisee Claims- Wave I and
> ILKB Franchisee Claims- Wave II:
>
> * * *
>
> (3) the role of FranChoice and its consultants generally in assisting
>     franchisee candidates in their quest for franchise opportunities;
>
> (4) FranChoice's guidelines, directions, protocols, and marketing
>     representations to franchisee candidates with respect to FranChoice's role
>     and its compliance with any applicable franchise sales laws;
>
> (5) FranChoice's procedures in working with franchisee candidates
>     generally;
>
> (6) the basis for FranChoice's representations regarding their role and
>     expertise in assisting franchisee candidates find franchise opportunities;
>
> (7) the franchisor business of ILKB, LLC;
>
> * * *

With regard to the above common fact issues, the parties agree that there is not a need for duplication of discovery efforts. Accordingly, the parties agree that[:]

(a) Plaintiffs in the Mt. Holly Kickboxing case will promptly serve documentary discovery on the common factual issues set forth above which are part of the discovery allowed below under "Additional Joint Discovery Issues," Section 2(b). As with all discovery of common fact issues, responses to that discovery may be used in ILKB Franchisee Claims- Wave I and ILKB Franchisee Claims –Wave II.

(b) After sufficient documentary discovery is completed, one 30(b)(6) deposition of FranChoice will be conducted regarding the above common factual issues in ILKB Franchisee Claims- Wave I and ILKB Franchisee Claims- Wave II; and(c)

After sufficient documentary discovery is completed, one 30(b)(6) deposition of non-party ILKB, LLC will be conducted regarding the above factual issues in ILKB Franchisee Claims- Wave I and ILKB Franchisee Claims- Wave II.

(Dkt. 24 at 3-4.)

Subsequently, while the Motion for Partial Dismissal was pending, the Court issued a Pretrial Scheduling Order in the present matter on September 4, 2019, which set the following relevant deadlines:

The parties must commence fact discovery procedures in time to be completed on or before **March 2, 2020**.

* * *

1. Except as otherwise specifically set forth this section, all motions that seek to amend the pleadings or to add parties must be filed and served **within 30 days of the Report and Recommendation on the pending motion to dismiss**.

2. All motions that seek to amend the pleadings to include punitive damages, if applicable, must be filed and served on or before **October 1, 2019**.

3. Except as otherwise specifically set forth this section, all non-dispositive motions and supporting documents, including those that relate to fact discovery, shall be filed and served on or before **March 20, 2020**.

(Dkt. 37 at 2, 4 (emphases in original).)  The Report and Recommendation on the partial motion to dismiss was issued on December 19, 2019 (Dkt. 55), making the deadline to amend the pleadings January 18, 2020.

An Amended Pretrial Scheduling Order was issued by the Court on January 23, 2020.  (Dkt. 64.)  Fact discovery was extended to **May 1, 2020**.  (*Id.* at 2.)  Non-dispositive motions relating to fact discovery were due on **May 20, 2020**.  (*Id.*)  Otherwise, the deadlines remained the same.

A Second Amended Scheduling Order was issued on April 6, 2020.  (Dkt. 68.)  Fact discovery was extended to **June 1, 2020**.  (*Id.* at 1.)  Non-dispositive motions relating to fact discovery were extended to **June 15, 2020**.  (*Id.*)  Dispositive motions were extended to **September 8, 2020**.  (*Id.*)  Otherwise, the relevant deadlines remained the same.  (*Id.* at 2.)

By virtue of a July 31, 2020 extension pursuant to the parties' stipulation, all dispositive motions needed to be filed on or before **October 6, 2020**.  (Dkt. 115 at 1.)

## C.  First Motion to Amend to Add Punitive Damages

Plaintiffs previously filed a timely motion to amend the Complaint to add a claim for punitive damages.  (Dkt. 40.)  The only substantive addition to the Amended Complaint was Count V seeking punitive damages.  This proposed count incorporated the allegations in the preceding paragraphs and then alleged as follows:

Defendants deliberately and intentionally disregarded the rights of Plaintiffs and disregarded the substantial likelihood of serious injury and damages to

4

Plaintiffs by representing that they offered to match Plaintiffs only with franchises that Defendants had investigated and vetted; that such franchises were of high quality; and that Defendants would provide Plaintiffs with all knowledge necessary to make an informed decisions [sic], when, in fact:

- Defendants knew that the founder of ILKB, Michael Parrella, had filed for bankruptcy in 2003 and that his discharge had been vacated in 2008; and knew or should have known, in the exercise of reasonable inquiry of Parrella's bankruptcy consistent with their representations to Plaintiffs, that Parrella's discharge had been revoked for failure to pay federal taxes and that there were two adversary proceedings in the bankruptcy accusing Parrella of fraud and fraudulent transfers.

- Defendants failed to perform any serious, systematic or professional due diligence upon ILKB; instead all they did was talk to a few existing franchisees, many of whom did not own the type of ILKB franchise that Plaintiffs were considering buying, and Defendants prepared no report, summary or investigation of ILKB.

- Defendants simply took representations of ILKB about the nature of the franchise, including the representations that it was suitable for absentee ownership; that no units had closed; that average ILKB franchisees made revenues and profits at a certain level; and that ILKB did all of the marketing for franchisees, and passed them on to Plaintiffs without checking on them.

- Defendants knew that ILKB engaged in blatantly illegal marketing techniques as early as March 2015 and never questioned whether such techniques had ceased, thus exposing Plaintiffs to the high likelihood, if not certainty, that Plaintiffs would be the victims of fraud.

- Defendants disregarded complaints and warning signs from ILKB franchisees as the whining of "stupid, selfish and ungrateful franchisees" instead of investigating such complaints and determining whether they were true.

- Defendants made specific representations as set forth in the proposed second amended complaint about ILKB without investigating or verifying them, when such representations

were false and were known or should have been known to
Defendants as false.

(Dkt. 42-2 ¶ 42.)

On May 6, 2020, the Court granted in part and denied in part the motion, allowing

only the following allegations in support of the proposed Count V for punitive damages

to be added:

Defendants deliberately and intentionally disregarded the rights of Plaintiffs
and disregarded the substantial likelihood of serious injury and damages to
Plaintiffs by representing that they offered to match Plaintiffs only with
franchises that Defendants had investigated and vetted; that such franchises
were of high quality; and that Defendants would provide Plaintiffs with all
knowledge necessary to make an informed decisions [sic], when, in fact:

- Defendants made specific representations as set forth above
  about ILKB without investigating or verifying them, when
  such representations were false and were known or should
  have been known to Defendants as false.

As a result of Defendants' deliberate disregard of Plaintiffs' rights, Plaintiffs
are entitled to punitive damages.

(Dkt. 69 at 21-22.)

On May 19, 2020, Plaintiffs objected to this Court's Order on punitive damages.

(Dkt. 72.)  No mention was made at this time that another amendment would be

necessary.

On June 15, 2020, Senior United States District Judge Michael J. Davis affirmed

the Order on punitive damages.  (Dkt. 77.)

**D.    Motions for Summary Judgment**

In a related matter against FCI involving the same Plaintiffs' legal counsel, *Mount

Holly Kickboxing LLC v. FranChoice, Inc.*, Case No. 19-cv-300, on April 28, 2020, the

6

Plaintiffs in that case moved for summary judgment on their claim under the North Carolina Deceptive and Unfair Trade Practices Act claim.  (*See* Case No. 19-cv-300, Dkt. 57.)  In their May 19, 2020 opposition, FCI asserted that "while [plaintiffs'] Complaint mentions some of the website statements, it does not identify them as misrepresentations—rather they appear to be identified in an effort to establish reliance. Accordingly, Plaintiffs' new theory should not be considered.  (*Id.*, Dkt. 86 at 33-34 (citations omitted).)

In the present matter, the parties filed their respective motions for summary judgment on October 6, 2020.  (Dkts. 126, 132.)

**E.     Present Motion to Amend**

On June 25, 2020, Plaintiffs filed the present Motion to Amend Complaint, which was heard by the Court on September 11, 2020.

The present proposed fourth amended complaint[1] deletes Count V for punitive damages in its entirety.  It instead proposes to assert a claim for punitive damages under the New York Franchise Sales Act and the fraud common law claims.  (Dkt. 82-2 at 28-29, ¶¶ 29, 32.)[2]

---

[1]     The Court notes that after Plaintiff filed the present motion to amend, the parties filed a stipulation to amend the then-operative Second Amended Complaint to delete allegations regarding punitive damages that were inadvertently included by Plaintiffs in Count V, which had been excluded by the Court.  (Dkt. 95.)  The Court granted the stipulation to amend and the operative Third Amended Complaint was filed on July 8, 2020.

[2]     Except for depositions, all page numbers refer to the CM/ECF pagination.

The crux of the proposed amendments is focused on the alleged misrepresentations made by Defendants.  In the operative Third Amended Complaint, it appears that Plaintiffs referred to representations made on FCI's website and by Fanning regarding their services and qualifications in terms of Plaintiffs' reliance on Defendants' misrepresentations, but did not assert that they were in of themselves misrepresentations. (Dkt. 107 *compare* ¶¶ 12, 13, 17, *with* ¶ 16.)  The operative paragraph 13 provides:

> 13.   Through its website (https://www.franchoice.com/), FCI held itself out as directing prospective franchisees to "high quality franchise businesses that match your requirements" and that it would match "entrepreneurs like you with the perfect franchise business."  FCI stressed that Plaintiffs could "avoid the confusion of researching" franchise opportunities and could focus on those franchises that FCI had "selected …as franchise businesses matching [his] requirements."  FCI further stated that "[t]hey will be by your side coaching you and making sure you are getting the information you need in order to make the best decision for you."

(*Id.* ¶ 13.)

In their proposed amendment, Plaintiffs also added a new header with respect to paragraphs 12-13 titled "FranChoice and Fanning's Misrepresentations About Themselves."  (Dkt 82-2 at 18.)  With respect to the representations made to Plaintiffs, proposed amended paragraph 13 inserts modified representations made by Defendants that Giacopelli read on FCI's website:[3]

---

[3]   The Court notes that the representations made by Fanning to Plaintiffs as alleged in paragraph 12 remain the same.  (Dkt. 82-2 at 18-19.)

13.    ~~Through its~~ Before engaging Fanning, Giacopelli reviewed FranChoice's website (https://www.franchoice.com/), ~~FCI held itself out as directing prospective franchisees to "high quality franchise businesses~~).  The website contained the following representations:

(a) Sorting through franchise opportunities was a daunting task and it was unlikely that ~~match your requirements" and that it~~ a lay person, without knowledge or experience, would ~~match "entrepreneurs like you with the perfect~~successfully find a franchise ~~business."~~that was safe and reliable and fit their needs.

(b)   FCI had experienced, expert franchise consultants who offered credible counseling and advice and would guide Giacopelli through the selection process.

(c)   FCI ~~stressed~~had already pre-screened hundreds of franchise opportunities with "exacting standards" so that ~~Plaintiffs could "~~Giacopelli would avoid the confusion of researching~~ franchise opportunities~~ franchises and could focus on ~~those franchises that FCI had "selected …as franchise businesses matching [his] requirements."~~"high quality" and "safe" opportunities that FCI would present to him.

(d)   The franchisors FCI offered to candidates "must meet the exacting standards we have set to be included in our inventory.  We examine the record of the franchisor relating to litigation, failures and, most importantly, the satisfaction of the existing franchisees with the people and opportunity…."

\* \* \*

(*Id.* at 19.)

The remainder of the amendments deal with the falsity of the representations. While the operative Third Amended Complaint already asserts that the representations at issue are false, the proposed amended complaint contains more facts as to why the representations are false, especially as it relates to the new allegations regarding Defendants' alleged representations as to the services provided by FCI as stated on their

website and by Fanning:

## The Falsity of Defendant's Representations about ILKB

21.    After opening the business, Plaintiffs learned that the representations that

FCI and Mr. Fanning and others had made to Giacopelli about ILKB were not true:

a.    ILKB franchisees did not generally become profitable within three to six months. FCI and Fanning had no basis for this representation since it would require access to individual franchisees' financial records, which they did not have, and ILKB did not collect information from franchisees on their profitability prior to 2017.

b.    ILKB franchisees did not generally make a profit of $4,000 to $15,000 per month, and there was no basis on which either Defendants or ILKB could make this representation as it would require access to individual franchisees' financial records, which neither FCI nor Fanning had. since ILKB did not collect profitability information from franchisees at that time. In addition FCI's and Fanning's representations of earnings were unlawful under federal and state franchise laws. FranChoice and Fanning, as "franchise experts" knew or should have known that providing such statements, outside of a Franchise Disclosure Document, was unlawful.

c.     The cost of setting up a studio far exceeded Defendants' estimates. FCI and Fanning had no reasonable basis for making these representations as they would require access to individual franchisees' financial records, which they did not have.

d.     It was not possible to operate the franchise as an absentee owner; in fact, it required the full-time attention of the owner.  FCI and Fanning knew or should have known, as "franchise experts," that very few franchises succeed without full-time (or more) involvement of the owner and that franchise systems that have "absentee owners" usually are mature systems with widely recognized brand names and well-established procedures, not start-ups, without name recognition, seasoned management and a track record spanning at least one franchise term.

e.     It was not possible to open additional locations with the profits of one or two locations.  FCI and Fanning lacked any reasonable basis for these representations and knew they were not true because, at the time they were made, there were few, if any ILKB franchisees that had actually opened multiple units.

f.     ILKB's marketing was not effective enough to make the franchise profitable.   FCI and Fanning's representations that ILKB had marketing resources to "ensure each outlet's success" lacked any basis in fact, as they had insufficient knowledge of the actual marketing that ILKB and franchisees did.

g.     Contrary to FCI and Mr. Fanning's representations, the representations that each franchise would generate $100,000 a year or more of "mailbox money" was baseless and false, inasmuch as FCI and Fanning had no access to franchisees' financial information and ILKB did not collect such information.

## ~~Because FranChoice's represented~~ The Falsity of FCI and Fanning's Representations About their Services

22.     FCI and Fanning's representations to Giacopelli about FCI's services were false for the following reasons:

a. FCI's representation that it used "exacting standards" to select "high quality" franchises was false because FCI's "screening" process considered only whether the franchisor had available territories, a communication system for franchise sales, "unit economics" and whether franchisees were "happy."  It did not consider the length of time the franchisor had been franchising, the experience of its staff and executives, the number of franchisees who had actually been operating

for at least a year, the actual financial results of franchisees or any publicly available information about the franchisor, including its history of litigation or franchise law violations.

b. FCI's representations that it would direct Giacopelli to a "safe," "high quality franchise businesses," and that FranChoice were false because FCI did not review ILKB to determine whether it was "safe" or "high quality."

c. FCI's representations that it had reviewed the record of litigation of the franchises that it offered was false because FCI did not conduct any such review.

d. FCI and Fanning's representations that FCI would "make sure you are getting the information you need," and because Fanning's represented that the " was false because there was substantial, publicly-available adverse information about ILKB and its founder, Michael Parrella, that neither FCI nor Fanning bothered to look for, find and disclose to Giacopelli.

e. Fanning's representations that a franchise provided "a tried and proven concept with operations, marketing, distribution, accounting, technical support, brand, etc. all in place, tested, re-tested and ready for a sharp, hard-working entrepreneur to join the team" was false because ILKB was an inexperienced, incompetent franchisor that did not have the experience or capacity to support franchisees.

22. f. FranChoice's representations that the franchisor's FDD would provide information on "any relevant litigation history of the company and its officers or any "contain, among other potentially adverse information," FranChoice and Fanning had a duty to make reasonable efforts to verify that ILKB was a "high quality" franchise; that the "information" they provided was true; and that the FDD indeed provided information on things, relevant litigation history and "other potentially adverse information, was false because ILKB had extensive disclosable litigation and Michael Parrella's bankruptcy that it had unlawfully not disclosed in the FDD. Additionally, the FDD falsely stated that ILKB did not take rebates from suppliers to franchisees, falsely stated the number of franchisees that had been terminated or who had left the system, and contained unlawful financial performance representations.

FranChoice and Fanning either failed to do any due diligence on ILKB or did do due diligence and failed to disclose their findings to Giacopelli. As an example, a 30-minute search on pacer.gov, which contains records of lawsuits in federal courts, would have disclosed that Michael Parrella, the founder of ILKB, had been discharged from bankruptcy in 2008; that he had been sued twice for fraud in the course of that bankruptcy; and that FC Online Marketing, an affiliate of ILKB, had also

~~been charged with fraud or violation of franchise laws in various lawsuits.~~
~~Had FranChoice or Fanning disclosed any one of these lawsuits or~~
~~Parrella's bankruptcy, Giacopelli would never have purchased an ILKB~~
~~franchise.~~

23. Defendants knew that Plaintiffs' purchase of an ILKB franchise would require Plaintiff to make a substantial investment in the franchise in excess of $300,000. Defendants deliberately and intentionally disregarded the rights of Plaintiffs and disregarded the substantial likelihood of serious injury and damages to Plaintiffs by (a) making the representations about Franchoice and Fanning set forth above, knowing that they were false, and intending to induce Plaintiffs to purchase an ILKB franchise in reliance upon FranChoice and Fanning's representations about their expertise and undertakings set forth above; and (b) making the representations about ILKB set forth above, knowing that they were false, or knowing that there was no basis for them, and simply passing them on without any effort to verify them.

~~23.~~

(Dkt. 82-2 at 25-27.)

## II.   LEGAL STANDARD

Plaintiffs' Motion to Amend is generally governed by Rules 15 and 16 of the Federal Rules of Civil Procedure and Local Rule 16.3 of the Local Rules for the District of Minnesota.

### A.   Rule 15

Federal Rule of Civil Procedure 15(a) provides that leave to amend "shall be freely given when justice so requires."  The determination as to whether to grant leave to amend is entrusted to the sound discretion of the trial court.  *See, e.g.*, *Niagara of Wis.*

*Paper Corp. v. Paper Indus. Union Mgmt. Pension Fund*, 800 F.2d 742, 749 (8th Cir.

1986) (citation omitted).  The Eighth Circuit has held that "[a]lthough amendment of a

complaint should be allowed liberally to ensure that a case is decided on its merits . . .

there is no absolute right to amend."  *Ferguson v. Cape Girardeau Cty.*, 88 F.3d 647,

650-51 (8th Cir. 1996) (citing *Thompson-El v. Jones*, 876 F.2d 66, 67 (8th Cir. 1989);

*Chesnut v. St. Louis Cty.*, 656 F.2d 343, 349 (8th Cir. 1981)).  Denial of leave to amend

may be justified by "undue delay, bad faith on the part of the moving party, futility of the

amendment or unfair prejudice to the opposing party."  *Sanders v. Clemco Indus.*, 823

F.2d 214, 216 (8th Cir. 1987) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  With

respect to Rule 15, Defendants only argue that they will suffer unfair prejudice as a result

of this late proposed amendment.  (Dkt. 97 at 20-23.)

## B.    Rule 16

Under Rule 15(a), leave to amend should be granted liberally, if "justice so

requires."  However, the Eighth Circuit has held that when a party has filed a motion to

amend the complaint after the deadline provided in a court's pretrial scheduling order,

then the court may properly require, pursuant to Federal Rule of Civil Procedure 16(b),

that good cause be shown for leave to file a pleading that is out of time with that order.

*See Freeman v. Busch*, 349 F.3d 582, 589 (8th Cir. 2003) (citing *In re Milk Prod.*

*Antitrust Litig.*, 195 F.3d 430, 437 (8th Cir. 1999)).  "If we considered only Rule 15(a)

without regard to Rule 16(b), we would render scheduling orders meaningless and

effectively would read Rule 16(b) and its good cause requirement out of the Federal

Rules of Civil Procedure." *In re Milk Prod. Antitrust Litig.*, 195 F.3d at 437-38 (citation omitted).

Scheduling orders pursuant to Rule 16(b)(1) "assure[ ] that at some point both the parties and the pleadings will be fixed . . . ." Fed. R. Civ. P. 16(b), advisory committee's note to 1983 amendment.  Moreover, "Rule 16(b) assures that '[a] magistrate judge's scheduling order 'is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded . . . without peril.'" *Archer Daniels Midland v. Aon Risk Servs., Inc.*, 187 F.R.D. 578, 582 (D. Minn. 1999) (quoting *Gestetner Corp. v. Case Equip. Co.*, 108 F.R.D. 138, 141 (D. Me. 1985)).  Under Rule 16(b), "[a] schedule may be modified only for good cause and with the judge's consent."  Fed. R. Civ. P. 16(b)(4).  Similarly, Local Rule 16.3 requires a party moving to modify a scheduling order to "establish good cause" for the proposed modification.  Further, regarding the timing of when such a motion must be made, Local Rule 16.3(d) states, "[e]xcept in extraordinary circumstances, before the passing of a deadline that a party moves to modify, the party must obtain a hearing date on the party's motion to modify the scheduling order.  The hearing itself may take place after the deadline."

"The primary measure of good cause is the movant's diligence in attempting to meet the order's requirements."  *Sherman v. Winco Fireworks, Inc.*, 532 F.3d 709, 716-17 (8th Cir. 2008) (citing *Rahn v. Hawkins*, 464 F.3d 813, 822 (8th Cir. 2006)); *see also* Fed. R. Civ. P. 16(b), advisory committee's note to 1983 amendment ("[T]he court may modify the schedule on a showing of good cause if it cannot reasonably be met despite the diligence of the party seeking the extension.").  "[T]he 'good cause' standard [of Rule

16(b)] is an exacting one, for it demands a demonstration that the existing schedule cannot be reasonably met despite the diligence of the party seeking the extension." *Scheidecker v. Arvig Enters.*, 193 F.R.D. 630, 632 (D. Minn. 2000) (citation omitted).

While the prejudice to the nonmovant resulting from modification of the scheduling order may also be a relevant factor, generally, the Court will not consider prejudice if the movant has not been diligent in meeting the scheduling order's deadlines. *See Bradford v. DANA Corp.*, 249 F.3d 807, 809 (8th Cir. 2001) (concluding that there was "no need to explore beyond the first criterion, [diligence,] because the record clearly demonstrate[d] that Bradford made only minimal efforts to satisfy the [scheduling order's] requirements"). In short, Rule 16(b) focuses on "the diligence of the party seeking to modify a Scheduling Order, as opposed to the litany of unpersuasive excuses, inclusive or inadvertence and neglect, which commonly undergird an untimely Motion to Amend." *Scheidecker*, 193 F.R.D. at 632 n.1 (citations omitted).

With these standards in mind, the Court turns to Plaintiffs' Motion to Amend.

### III.   ANALYSIS

Plaintiffs argue that good cause exists to allow what amounts to the fourth amended complaint on the grounds that the scheduling order called for motions to amend the pleadings to be brought by January 19, 2020 and Plaintiffs did not depose FCI's founder and CEO, Jeff Elgin ("Elgin") about the representations about FCI's services until February 6, 2020, and did not depose its consultant, Defendant Fanning, until February 12, 2020. (Dkt. 81 at 15.) Defendants counter that Plaintiffs had already learned the information that Plaintiffs claimed to have learned from Elgin and Fanning by

16

November 19, 2019, through FCI's Rule 30(b)(6) depositions and written discovery. (Dkt. 97 at 15-18.)

As a starting point, there is no reason why Plaintiffs could not have previously made the allegations in paragraph 13 of the proposed amendment or characterized paragraphs 12 and 13 as "FranChoice and Fanning's Misrepresentations About Themselves," as they now attempt to do. These are all representations observed by Plaintiff Giacopelli on FCI's website or obtained by him from Fanning. This was information obviously in the possession of Plaintiffs since the start of this action given that it stems from Giacopelli's own observations. While it is not entirely clear, it appears that Plaintiffs are arguing that the reason why they could not allege fraud as to these representations is that they did not have enough evidence to determine that Defendants' representations were false for the purposes of the particularity requirement of Rule 9(b):

> While Plaintiffs believed that Defendants' representations about their services were misrepresentations, Plaintiffs did not have the evidence to meet the pleading requirements of Rule 9(b). Specifically, until it could be determined that FranChoice and Fanning had not (a) used "exacting standards" to pre-screen franchisors for "safe" and "high-quality" franchises; (b) taken any steps to determine that ILKB was a "safe" or "high-quality" franchise; (c) reviewed ILKB's litigation history; and (d) provided Giacopelli with the information that he needed, Plaintiffs did not believe they could, in good faith, allege fraud consistent with the requirements of Rule 9(b).

(Dkt. 81 at 16.) Plaintiffs claim that only in February 2020 were they able to conduct the individual deposition of Elgin and the individual consultant, Fanning, during which "Plaintiffs learned that the Services Representations were not simply negligence or gross negligence, but were outright false and were known (or should have been known to Defendants) to be false." (*Id.* at 7.)

It is difficult to comprehend why Plaintiffs needed to shore up the particularity of their fraud related claims for the purposes of Rule 9(b). The amended allegations in paragraph 13 are not materially different from the original allegations, primarily using different language from the website or rephrasing the allegations and more importantly now actually characterizing the representations relating to the services Defendants provided as misrepresentations in their own right, as opposed to the basis of Plaintiffs' reliance on Defendants' representations as it is presently alleged.

Moreover, Defendants have not even argued that the fraud-related claims should be dismissed for a lack of particularity under Rule 9(b) as to the present allegations, either with respect to the earlier First Amended Complaint as part of Defendants' earlier partial motion to dismiss or in their present motion for summary judgment. Indeed, Defendants have only argued a lack of particularity as to the original Complaint, which Plaintiffs remedied via the Amended Complaint.

Instead of the proffered reason for the amendments, it appears that this late-proposed amendment was the result of a tactical decision by Plaintiffs to address the possible deficiency in its fraud-related claims regarding the extent of the actionable misrepresentations involved, given the arguments made by FCI in opposition to plaintiffs' motion for partial summary judgement in the earlier related *Mount Holly* case, *see supra*, and to get another bite at the proverbial apple with respect to the extent of punitive damages, given the Court's order denying part of their motion to amend to add punitive damages. However, such a tactical decision after the expiration of a deadline to amend does not amount to an extraordinary circumstance to bring the present untimely

motion, let alone establish diligence for the purposes of the good cause requirement of Rule 16. *See Morrison Enter., LLC v. Dravo Corp.*, 638 F.3d 594, 610-11 (8th Cir. 2011) (affirming district court's denial of motion for leave to amend on ground that a tactical choice not to pursue a claim earlier did not show diligence); *see also Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.*, 09-cv-1091 (JNE/JSM), 2010 WL 4193076, at *7 (D. Minn. Oct. 7, 2010) ("A strategic decision at the beginning of the case to not allege a MUTPA claim, because Aviva did not believe it had a basis for punitive damages at that time, does not constitute good cause for seeking the amendment now."); D. Minn. LR 16.3(d).

In any event, even to the extent that the knowledge of the fraud needed to be pleaded with particularity, *see Drobnak v. Andersen Corp.*, 561 F.3d 778, 783-84 (8th Cir. 2009) ("[W]hen the facts constituting the fraud are peculiarly within the opposing party's knowledge . . . such allegations may be pleaded on information and belief."), the Court concludes that Plaintiffs had sufficient information regarding the Defendants' screening process as a set forth in paragraph 22 of the proposed amended complaint as of November 2019, well prior to the January 2020 motion to amend deadline. Specifically, during the November 18, 2019 FCI Rule 30(b)(6) deposition, Elgin testified that when determining whether a franchisor met their "exacting standards," this determination did not include specifically looking at a litigation history, although FCI used this factor to determine whether to refer a franchise, and did include looking at a franchisor's franchise disclosure documents ("FDD") to see if there are any bankruptcies or litigation history, and if there was, to ask the franchisor questions about this. (Dkt. 99, Ex. D at 49.) Other factors considered were the period of time that a franchisor was in operation (there was

19

not a minimum amount of time required), whether the franchisees were happy, and whether there were territories available.  (*Id.* at 50-51, 54.)  They also looked to the franchisor's financials, as one of the many factors considered.  (*Id.* at 53.)  With respect to FCI screening opportunities, Elgin testified:

> Q.     Okay. This exhibit also refers to "pre-screened as high quality franchise businesses."
>
> What does "pre-screened" mean?
>
> A.     We prescreen franchisors, it means basically four things.  We review their FDD document, we conduct interviews with management executives at the franchise company, we conduct interviews with existing franchisees, and we either through interviews or through material review will see if they have a good communication system, documentation system for their communication with prospective franchisees.

(*Id.* at 55.)  FCI's other Rule 30(b)(6) deponent, Trent Halvorson ("Halvorson"), FCI Vice-President of Franchise Relations, testified on November 19, 2019 that FCI's screening criteria involved looking for "happy franchisees" and talking with several franchisees, looking at their current sales process, obtaining information from franchisees as to whether there was strong unit economics, "looking at some marketing materials," and reviewing the FDD.  (Dkt. 99, Ex. F at 41-49, 53.)  In addition, Halverson testified that FCI did not have in place any sort of standard regarding how long a franchisee would need to be in business to be included as part of the validation process for onboarding a franchise like ILKB.  (*Id.* at 116-17.)

As it relates to the FDD, Elgin testified that he "quickly reviewed the FDD and highlighted a few items" he wanted to talk about with Michael Parrella.  (*Id.*, Ex. D at 56.)  Halvorson testified that he focused primarily on items 3 and 20 of an FDD as part of

his evaluation.[4]  (*Id.*, Ex. F at 53.)  Moreover, as to the FDD, Elgin testified that the FDD

of a franchisor is not reviewed again after the initial "pre-screening."  (*Id.*, Ex. D at 56-

57.)  Elgin also testified that information from its prescreening does not generally go to

its consultants, such as Fanning, that the FDD is not provided to the consultants, and that

it not recommended by FCI that the consultant obtain a copy of the FDD.  (*Id.* at 67.)

 With regard to bankruptcy and litigation history, Halvorson testified in November

2019 that he had reviewed the ILKB 2013 FDD and had read the item disclosing that

Parrella had a bankruptcy in 2003 and that the order of discharge was revoked in January

2008, but did not understand what that meant.  (*Id.*, Ex. F at 61-62.)  The only other

inquiry made regarding the bankruptcy was that Halvorson asked Parrella about the

bankruptcy, and Halvorson relied on Parrella's representation that "its taken care of."

(*Id.* at 62.)  Halverson also testified that he took the representation in the FDD that there

was no litigation at face value with no further follow-up.  (*Id.* at 68.)  He further testified

that the only other time that FCI looked at an FDD for ILKB was when there were

increases in ILKB franchise fees (on two separate occasions).  (*Id.* at 135-36.)  Halverson

also noted in conjunction with the increases in franchise fees that FCI received a

commission with respect to a sale of an ILKB franchise.  (*Id.* at 136-37.)

 As set forth above, by November 2019, Plaintiffs had information regarding

Defendants' screening process or lack thereof, the application of the screening process as

---

[4] The ILKB 2013 FDD Item 3 related to litigation and Item 20 related to outlets and
franchisee information.  (Dkt. 43-1 at 22.)

it related to ILKB, FCI's evaluation of the FDD (including the bankruptcy and litigation history), and the fact that the FDD was not shared with its agents, such as Fanning.

Moreover, the FDDs relied upon by Plaintiffs, the litigation related to ILKB, and the discharge of Parrella's bankruptcy were all available to Plaintiffs well before the January 18, 2020 motion to amend deadline, as the FDDs were produced by November 2019, the bankruptcy discharge had been previously used by Plaintiffs in their initial motion to amend to add punitive damages in October 2019, and the records were otherwise publicly available from a period between 2013 through 2017.  (*See* Dkt. 43-1; Dkt. 82-2 at 33-95; Dkt. 82-3 at 22-153; Dkt. 82-4 at 1-99; Dkt. 82-5 at 4-19; Dkt. 98 ¶¶ 4-6, 11-12.)  Indeed, the litigation, the bankruptcy, and Defendants' lack of due diligence in discovering this information, given its public availability, as well as the FDD, are all referenced in the April 2019 Amended Complaint.  (Dkt. 14 ¶¶ 22-23.)

In sum, while some evidence may have been available after the January 18, 2020 cut-off for motions to amend, the key evidence on which Plaintiffs rely was available months before the motion to amend deadline expired.  Consequently, the failure of Plaintiffs to move to amend for more than half a year (or to seek an extension of time to amend) demonstrates a lack of diligence incompatible with good cause under Rule 16. *See Moldex Metric, Inc. v. 3M Co.*, No. CV 14-1821 (JNE/FLN), 2016 WL 845264, at *2 (D. Minn. Mar. 4, 2016) ("Although documents were produced and depositions took place after July 1, a substantial portion of the evidence on which Moldex Metric relied to support its second motion was available to it months before July 1.  Moldex Metric could have presented the essence of its second motion to amend to claim punitive damages by

July 1. Its failure to do so reveals a lack of diligence that is incompatible with a finding of good cause."); *see also Aviva*, 2010 WL 4193076 at *7 ("[W]hile it is true that the depositions of Kalleymeyn and Harris were taken shortly before Aviva brought its motion to amend, it is also uncontroverted that Aviva knew virtually the same facts it learned at these depositions when it obtained [a declaration] . . . in April 2010 . . . .").

Even assuming that Plaintiffs first learned of sufficient facts to bring the present proposed amendments by February 2020 as claimed, that does not explain why Plaintiffs waited until June 2020 to file the present Motion. Plaintiffs appear to intimate that COVID-19 may have impeded their motion but do admit that they were able to engage in significant discovery during the pandemic. (Dkt. 81 at 15.) Moreover, the District of Minnesota was never closed due to the pandemic. *See* General Order in re: Court Operations Under the Exigent Circumstances Created by COVID-19 (March 13, 2020) ("The United States Courthouses in Minneapolis, St. Paul, Duluth, and Fergus Falls will remain open for business, subject to [limitations relating to jury trials and criminal proceedings]."). In other words, nothing precluded Plaintiffs from bringing the present motion to amend soon after the February 2020 depositions, instead of waiting until the end of June.

Plaintiffs also try to justify their failure to file the present Motion earlier by pointing to the fact that this Court ruled on their motion to amend to add punitive damages on May 7, 2020, which Judge Davis affirmed on June 16, 2020. (Dkt. 81 at 15-16.) However, even accepting this assertion at face value, considering the expiration of the motion to amend deadline in January 2020, it was incumbent on Plaintiffs to take

steps to protect their interests and comply with the mandates of the pretrial scheduling order by at least seeking a motion to extend the deadline to amend the pleadings to sometime after the Court's order on punitive damages, similar to what was initially set forth in the initial Scheduling Order (Dkt. 37) with respect to the motion to amend deadline and the then-pending Report and Recommendation on Defendants' partial motion to dismiss.  *See AGA Med. Corp. v. W.L. Gore & Assocs., Inc.*, No. CV 10-3734 (JNE/JSM), 2012 WL 12888665, at *7 (D. Minn. Oct. 5, 2012) ("Even accepting this assertion at face value, considering that the acquisition had been completed over a year prior to the effective date of the licenses, it was incumbent on both AGA's corporate representatives and its litigation counsel, to take steps to protect the rights of the proposed St. Jude plaintiffs and comply with the mandates of the pretrial scheduling order, L.R. 16.3 and Rule 16.").  Instead, Plaintiffs waited at their own peril until after the close of fact discovery and the eve of summary judgment to bring this Motion to apparently expand their theory of the misrepresentations at issue in this case both as to the merits of the underlying claims and for the purposes of punitive damages, thereby unfairly prejudicing Defendants for the purposes of Rule 15 and Rule 16.

"This lack of action [by Plaintiffs] may be careless, inadvertent, strategic or due to other pressing matters, but it does not amount to the requisite due diligence needed to bring the present motion."  *AGA Med. Corp.*, 2012 WL 12888665, at *7 (citing *C.H. Robinson Co. v. Zurich Am. Ins. Co.*, Civ. No. 02–4794 (PAM/RLE), 2004 WL 1765320 at *1 (D. Minn. Aug. 05, 2004), quoting *N. Star Mut. Ins. Co. v. Zurich Ins. Co.*, 269 F.

Supp. 2d 1140, 1144 (D. Minn. 2003)) ("Carelessness does not excuse dilatoriness and 'offers no reason for a grant of relief.'").

For all of the reasons stated above, Plaintiffs' Motion to Amend is denied.

## IV.   <u>ORDER</u>

Based on the files, records, and proceedings herein, **IT IS ORDERED THAT**:

Plaintiffs' Motion to Amend Complaint (Dkt. 79) is **DENIED**.


DATED: November 25, 2020                    <u>*s/Elizabeth Cowan Wright*</u>
                                            ELIZABETH COWAN WRIGHT
                                            United States Magistrate Judge